# Exhibit 2

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO: 50-2023-CA-000091
DIVISION: AF

LINDSEY LEHR, on behalf of herself and those similarly situated,

        Plaintiff,

v.

CRYO-CELL INTERNATIONAL, INC., a foreign corporation

        Defendant.

**CLASS REPRESENTATION**

## ACCEPTANCE OF SERVICE

The undersigned accepts service of the Summons and Complaint in the above-captioned matter as of the date set forth below on behalf of Cryo-Cell International, Inc., which shall have until March 21, 2023 to move or otherwise respond including, but not limited to, any motion to contest forum, venue, or jurisdiction, or to compel arbitration.  Cryo-Cell International, Inc. retains all defenses or objections, including to the lawsuit or to the jurisdiction or venue of the court, except for objections based on a defect in the summons or in the service of the summons.

Dated February 13, 2023.

*/s/ Ernest J. Marquart*
Ernest J. Marquart, Florida Bar No. 905860
Jeffrey B. Fabian, Florida Bar No. 85868
SHUMAKER, LOOP & KENDRICK, LLP
101 East Kennedy Blvd., Suite 2800
Tampa, Florida 33602
Telephone (813) 229-7600
Facsimile (813) 229-1660
emarquart@shumaker.com (Primary e-mail)
mdesilles@shumaker.com (Secondary e-mail)
jfabian@shumaker.com (Primary e-mail)
ldyer@shumaker.com (Secondary e-mail)
***Attorneys for Cryo-Cell International, Inc.***

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

    CASE NO: 50-2023-CA-000091
    DIVISION: AF

LINDSEY LEHR, on behalf of herself and
those similarly situated,

           Plaintiff,

      v.

CRYO-CELL INTERNATIONAL, INC., a
foreign corporation

           Defendant.

**CLASS REPRESENTATION**

**SUMMONS**

THE STATE OF FLORIDA:
To Each Sheriff of the State:

    YOU ARE COMMANDED to serve this Summons and a copy of the complaint or petition
in this action on defendant:

CRYO-CELL INTERNATIONAL, INC.,
Registered Agent: Darrell C. Smither
101 E. Kennedy Blvd., Suite 2800
Tampa, FL 33602

1

Each defendant is required to serve written defenses to the complaint or petition on Alec H. Schultz and Carly A. Kligler, HILGERS GRABEN, PLLC, Plaintiff's attorney, whose address is 1221 Brickell Avenue, Suite 900, Miami, Florida 33131, Telephone: 305-630-8304, within twenty (20) days after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the clerk of this court either before service on plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint of petition.

**JOSEPH ABRUZZO**
**CLERK OF THE CIRCUIT**
**COURT & COMPTROLLER**

DATED on **Jan 11 2023**

By: _____

Clerk of Court **XXXXXX**

**JOSIE LUCCE**

2

(        )

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

> CASE NO: _____
> DIVISION: _____

LINDSEY LEHR, on behalf of herself and
those similarly situated,

> Plaintiff,

> v.

CRYO-CELL INTERNATIONAL, INC., a
foreign corporation

> Defendant.

Case Number: _____

**CLASS REPRESENTATION**

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

Plaintiff Lindsey Lehr, on behalf of herself and all others similarly situated, brings this

action against Defendant Cryo-Cell International, Inc. ("Cryo-Cell") and alleges as follows:

**INTRODUCTION**

1.       This is an action to address Cryo-Cell's false and misleading statements to parents

throughout the United States related to the efficacy of its umbilical cord blood banking program.

Although Cryo-Cell charges families thousands of dollars for its services, the evidence will show

that those services are largely worthless with regard to their advertised purpose.

2.       Cryo-Cell collects and stores umbilical cord blood throughout the United States by

aggressively marketing its services as potentially life-saving treatment options for children. The

core of Cryo-Cell's objectively manipulative and deceptive message to expectant parents is that,

by storing their child's cord blood following childbirth, the stem cells in their child's cord blood

can treat at least eighty serious medical conditions that the child or her siblings may develop.

1

Additionally, Cryo-Cell touts a sweeping range of additional medical conditions and injuries for which cord-blood may be approved for treatment in the future.

3.      What Cryo-Cell does not tell expectant parents is that the odds that their child can ever use their own cord blood for treatment are virtually zero.  Contrary to Cryo-Cell's claims, the Food and Drug Administration ("FDA") has only approved the use of a child's own cord blood for treatment of seven medical conditions—not eighty plus.  This is because a child's own cord blood often contains the same defects that caused the underlying medical condition for which treatment is sought.  In fact, Cryo-Cell's *own statistics* indicate that, of their 500,000-plus customers over the past 20 years, *only 2 children* have used their own cord blood for FDA-approved medical treatment.  And, while Cryo-Cell also pushes the use of a child's cord blood for treatment of siblings' medical conditions, such use is still incredibly rare—fewer than .0074% of Cryo-Cell customers.

4.      Unsurprisingly, Cryo-Cell does not reasonably disclose these statistics to expectant parents. Nor does it reasonably disclose that the vast majority of cord-blood transplants come from public banks, or that there may not be enough stem cells in a collection to be viable in a medical treatment setting.  This is especially true as a child ages, since the quantity of stem cells required for any given treatment increases as well.  Yet Cryo-Cell willingly sells parents storage of stem cells for eighteen years knowing that for the vast majority of this time the quantity of cells collected at birth is inadequate for any form of treatment.  Further, Cryo-Cell downplays the odds of a child finding a match through public cord blood banks or other sources.  And in the process, Cryo-Cell diverts hundreds of thousands of units of cord blood that might otherwise go to public banks— where they can be matched with an individual in need—to warehouses where the cord blood will almost certainly sit dormant.

5.      By preying on the fears of expectant parents in return for essentially nothing but false hope, Cryo-Cell reaps thousands of dollars from customers like Plaintiff by charging exorbitant processing and storage fees.  Plaintiff, on behalf of herself and class members defined below, brings this class action to redress injuries suffered because of Cryo-Cell's objectively deceptive, unfair, and fraudulent practices.

## PARTIES, JURISDICTION AND VENUE

6.      Plaintiff Lindsey Lehr is an individual who is domiciled in, and is a citizen of, Palm Beach County, Florida.  Plaintiff brings this action for a declaratory judgment and damages against Cryo-Cell based on Fla. Stat. § 501.211 and Florida common law.

7.      Defendant Cryo-Cell is, upon information and belief, a Delaware corporation with its principal place of business in Florida.  Cryo-Cell routinely conducts business, is registered to do business, and maintains an office for service of process in Florida.

8.      This Court has jurisdiction over Cryo-Cell because its principal place of business is in Florida.   In addition and/or in the alternative, this Court has jurisdiction over Cryo-Cell because it entered into a contract with Plaintiff in Florida and committed tortious conduct in Florida, resulting in injury to Plaintiff.

9.      Venue is proper in this Court because Cryo-Cell entered into a contract with Plaintiff in this County, a substantial amount of the events giving rise to the cause of action occurred in this county, Plaintiff resides in this county, and Plaintiff incurred injury in this county.

10.      All conditions precedent to the bringing of this action have occurred, or Cryo-Cell has waived them.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

11.     Cord blood consists of a child's blood and other biological material, including hematopoietic stem cells, that remain in the umbilical cord and placenta after the child is born. The stem cells in cord blood are unique because they can mature into different types of blood cells in the body.  As such, the use of stem cells from cord blood is approved by the FDA to treat certain diseases and blood related disorders, including certain kinds of leukemia and lymphoma.  Cord blood is collected by hospital staff after the umbilical cord is cut and clamped.  The blood is then drawn from the umbilical cord with a needle, attached to a bag, and shipped to a cord blood "bank" and cryogenically frozen for future use.[1]

12.     Children can receive treatment from cord-blood in one of two ways: an allogeneic transplant, in which the child receives cord blood donated by another person who has a cellular match to the child, or in much rarer circumstances, through an autologous transplant, where a child uses his or her own cord blood.[2]

13.     Likewise, cord blood itself is stored in one of two ways.  It is either donated by a child's parent to a public bank or it is banked through a private entity.  In the case of public cord blood banks, the stem cells in the donated cord blood can be used by anyone who is a match and could benefit from treatment.  Public cord-blood banks charge nothing for donation or storage of cord blood.[3]

14.     Private cord blood banking exists so that parents have the option to use their child's cord blood through autologous treatment for the child herself or through allogeneic transfer for a close family member—usually a sibling.  And the private cord-blood industry is booming.  By

---

[1] *Cord Blood Banking: FAQs*, Am. Coll. of Obstetricians and Gynecologists (last visited Nov. 9, 2022), https://www.acog.org/womens-health/faqs/cord-blood-banking.
[2] *Id.*
[3] *Id.*

some estimates, the private cord blood banking market was worth $27.8 billion as of 2020 and is expected to continue growing.[4]  Over 2.5% of births in the United States opt for cord-blood storage, and as of 2017, there were approximately 5 million cord blood units in private cord-blood banks.[5]

15.     Cryo-Cell is one of the oldest and most prominent private cord-blood banks. Founded in 1989, Cryo-Cell claims that it has more than 500,000 clients worldwide and boasts that, unlike many banking entities, it "operates its own state-of-the-art processing, testing and cryopreservation operation."[6]

16.     Currently, Cryo-Cell offers an option for the collection and storage of cord blood alone and an option for storage of cord blood and cord tissue.  Within each of those options, Cryo-Cell provides a "standard" and "premium" option.  The premium option allegedly uses a cord-blood processing technology called PrepaCyte-CB, "which yields the maximum recovery of healthy stem cells and provides superior red blood cell depletion over all other methods."[7]

17.     The purported benefit of storing cord tissue lies in the different types of stem cells present in the tissue.  Cryo-Cell states that these stem cells "help repair and heal the body in different ways than cord blood," including the "ability to inhibit inflammation following tissue damage, [and] secrete growth factors that aid in tissue repair and differentiate into many cell types

---

[4] *U.S. Cord Blood Banking Services Market Size, Share & Trends Analysis Report*, GRAND VIEW RESEARCH (last visited Nov. 9, 2022), https://www.grandviewresearch.com/industry-analysis/us-cord-blood-banking-services-market#:~:text=b.,USD%2027.8%20billion%20in%202020.
[5] *See id.*; *AAP stresses value of public vs. private cord blood banks*, HEALIO (Oct. 30, 2017), https://www.healio.com/news/pediatrics/20171027/aap-stresses-value-of-public-vs-private-cord-blood-banks.
[6] *Corporate Overview and Mission*, CRYO-CELL INT'L (last visited Nov. 9, 2022), https://www.cryo-cell.com/about/corporate-overview-mission.
[7] *PrepaCyte-CB: Choice cord blood processing method*, Cryo-cell Int'l (last visited Nov. 9, 2022), https://www.cryo-cell.com/difference/processing-technology.

including neural cells, bone cells, fat cells and cartilage."[8]  Cryo-Cell then posits that "extremely promising" research is underway concerning the use of stem cells in cord tissue to treat ALS, Alzheimer's, Parkinson's, diabetes, Muscular Dystrophy, strokes, and other injuries and medical conditions.[9]  Based on this "extremely promising" research, Cryo-Cell advises parents that tissue storage can "increase their child's access to these treatments in the future."[10]  According to Cryo-Cell, over 60 percent of its customers elect to store both cord blood and cord tissue.[11]

18.    None of Cryo-Cell's services comes cheaply.  To store cord blood alone, the "Processing, Testing & Medical Courier" fees run $1,500 for the standard plan and $1,850 for the premium plan.  Under either plan, parents pay $185 for the first year of storage for a total up-front cost of $1,685 for the standard plan and $2,035 for the premium plan.  After that, parents must pay an annual storage fee of $185.  By the child's eighteenth birthday, parents will have paid $4,830 for the standard plan and $5,180 for the premium plan.[12]

19.    The cost to store cord blood and tissue is substantially higher.  Like cord-blood storage alone, this option includes a standard and premium option.  The standard option costs $2,470 for "Processing, Testing & Medical Courier," while the premium plan is $2,820.  Either option requires the first year of storage up front, which is $370.  Parents then pay an additional $370 per year after that.  By the child's eighteenth birthday, parents will have paid $9,130 for the standard option and $9,480 for the premium plan.[13]

---

[8] *Cord Tissue Banking*, CRYO-CELL INT'L (last visited Nov. 9, 2022), https://www.cryo-cell.com/cord-tissue-banking.
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Cost of Cord Blood Banking*, CRYO-CELL INT'L (last visited Nov. 9, 2022), https://www.cryo-cell.com/cord-blood-banking-costs.
[13] *Id.*

20.     Lastly, Cryo-Cell also gives parents the option to prepay for everything up front. But parents receive no discount for this option—the total cost of the standard or premium plans for either cord blood only or cord blood plus tissue storage are the same as the annual installments.

21.     To lure expectant parents into such expensive contracts on top of an already expensive childbirth process, Cryo-Cell portrays to the objectively reasonable consumer that its services are a near all-encompassing biological insurance policy for their children.  For example, Cryo-Cell touts the following claims scattered throughout its website:

    a.   Banking "***help[s] protect your baby from 80-plus diseases***," and that "number is expected to continue to grow."[14]

    b.   "***Someone's own stem cells are always a perfect match for him or herself***. Siblings share a 25 percent chance of being a perfect match and a 50 percent chance of being a partial match. Altogether, this gives siblings a 75 percent chance of being a possible match. Since each parent provides markers used in matching, parents have a 100 percent chance of being a partial match."[15]

    c.   "[C]ord blood treatments have been performed ***more than 35,000 times*** around the globe to treat cancers (including lymphoma and leukemia), anemias, inherited metabolic disorders and some solid tumors and orthopedic repair."[16]

    d.   "Safeguarding your newborn stem cells ***is the healthiest investment you can make for your baby*** and your family."[17]

---

[14] *The Benefits of Banking*, CRYO-CELL INT'L (last visited Nov. 9, 2022), https://www.cryo-cell.com/cord-blood/banking-benefits.

[15] *Id.*

[16] *Cord Blood Banking: What is cord blood banking?*, CRYO-CELL INT'L (Nov. 9, 2022), https://www.cryo-cell.com/cord-blood-banking.

[17] *How Does Cord Blood Banking Work? Why Bank Cord Blood?*, YOUTUBE (May 20, 2013), https://www.youtube.com/watch?v=uuqGzMd808c.

e. "Cord blood stem cells are used to treat nearly 80 diseases including cerebral palsy, leukemia, autoimmune diseases, and genetic disorders."[18]

f. Cryo-Cell has a 100% "Viability Record," while the viability records for other banks is undisclosed.[19]

g. "[Cord blood is] [p]reserved for the child or other family members to treat nearly 80 diseases such as leukemia and lymphoma."[20]

h. "Beyond the current treatments, clinical trials are underway for cord blood's use in strokes, heart disease, diabetes, and many more regenerative therapies."[21]

i. "Promising research that could potentially impact a countless number of lives is being conducted in the treatment of autism, cerebral palsy, adult stroke and more."[22]

22. Cryo-Cell carefully tailors its marketing to create the false impression to the objectively reasonable consumer that a child's *own* cord blood can be used to treat that child for dozens of serious conditions. But like most things that seem too good to be true, so are Cryo-Cell's claims. Indeed, they are misleading or outright false.

23. Despite the obvious impression any reasonable consumer—let alone expectant parents—would take from Cryo-Cell's claims, the current odds of using a baby's own cord blood for treatment of *any* medical condition are virtually zero. In fact, as of 2015, "[t]he chance of baby later benefiting from his or her own banked cord blood is currently less than 0.04 percent,

---

[18] *Id.*

[19] *Cord Blood Banks*, CRYO-CELL INT'L (last visited Nov. 9, 2022), https://www.cryo-cell.com/cord-blood-banking-comparison.

[20] *Private vs. Public Banking*, CRYO-CELL INT'L (last visited Nov. 9, 2022), https://www.cryo-cell.com/cord-blood/private-vs-public-banking.

[21] *The Benefits of Banking*, supra note 14.

[22] *Cord Blood & Tissue Clinical Trials*, CRYO-CELL INT'L (last visited Nov. 9, 2022), https://www.cryo-cell.com/cord-blood-treating-diseases.

according to the [American Society for Blood and Marrow Transplantation]."[23] This is not only "because the diseases currently treatable with cord blood are fairly rare, but with many, the child's cord blood would be unusable because those stem cells contain the same genetic defects."[24] As the American College of Obstetricians and Gynecologists notes, autologous transplants are rare because a "child's stem cells cannot be used to treat genetic diseases in that child," as "[a]ll of the stem cells have the same genes that cause the disease."[25]

24.     Cryo-Cell's own data bears this out.  Although Cryo-Cell repeatedly claims that storing a baby's cord blood can be used to treat the baby for 80-plus diseases, Cryo-Cell is careful to hide the truth: of those 80 diseases for which the FDA has approved cord-blood treatment, only 7 of them are approved for autologous treatment, the vast majority of which are adult-onset conditions for which the quantity of cord blood collected at birth would be inadequate to use for any form of treatment.[26]  The remaining conditions are approved for cord-blood treatment only in allogeneic treatment.

25.     Remarkably, of the more than half-a-million Cryo-Cell customers over the past twenty years, Cryo-Cell customers have used their child's cord blood to treat the child for an FDA-approved purpose only *twice*.[27]  In other words, despite Cryo-Cell's promising claims that privately banking cord blood "help[s] protect your baby from 80-plus diseases," "[s]omeone's own stem cells are always a perfect match for him or herself," and that Cryo-Cell has a 100% "Viability Record," a baby's cord blood banked with Cryo-Cell is useful for FDA-approved treatments for

---

[23] Kelli B. Grant, *Is Cord Blood Banking Worth the Cost? Here's What the Experts Say*, NBC NEWS (July 29, 2015), https://www.nbcnews.com/business/consumer/cord-blood-banking-n400561.
[24] *Id.*
[25] *Cord Blood Banking: FAQs*, supra note 1.
[26] *Cord Blood & Tissue Clinical Trials*, supra note 22.
[27] *Cord Blood Transplants: Transplant/Infusion Matrix*, CRYO-CELL INT'L (last visited Nov. 9, 2022), https://www.cryo-cell.com/cord-blood/banking-benefits/transplant-matrix.

fewer than .0004% of Cryo-Cell customers.  Defendant's statements are intentionally deceptive and misleading, designed to induce new parents to spend thousands of dollars on a false sense of hope and security.

26.     Nowhere is this more readily apparent than from Cryo-Cell's online marketing material.  It can be discerned by comparing the chart of past cord-blood transplants to Cryo-Cell customers with a chart of FDA-approved treatments buried on another page of Cryo-Cell's website.[28]  Cryo-Cell likewise markets its storage services as biological insurance for a donor's siblings or other family members, but those claims are similarly flawed.  Based on the same chart, it appears that Cryo-Cell's customers have used one of their children's cord blood in FDA-approved treatment for one of the donor's siblings only 37 times over 20 years—or fewer than .0074% of Cryo-Cell customers.  The other 81 uses of a Cryo-Cell donor's cord blood, for either autologous or allogeneic treatment, appear to be associated with clinical trials for medical conditions not approved for cord-blood treatment by the FDA.

27.     Nor is that the only instance of Cryo-Cell's objectively false and misleading marketing.  For example, ***Cryo-Cell boasts that it has a 100% "Viability Record,"*** while other cord-blood banks do not disclose their figures.[29]  But nowhere on that webpage does Cryo-Cell explain what "viability record" means.  Read without the crucial context that Cryo-Cell buries through two subsequent links, a reasonable consumer would conclude that the viability record refers to the percentage of instances in which a donor's cord blood can be used to treat the 80-plus diseases that Cryo-Cell repeatedly markets—especially when combined with other statements like "[s]omeone's own stem cells are always a perfect match for him or herself."[30]

---

[28] *Compare id. with Cord Blood & Tissue Clinical Trials*, CRYO-CELL INT'L (last visited Nov. 9, 2022), https://www.cryo-cell.com/cord-blood-treating-diseases.

[29] *Cord Blood Banks*, supra note 19.

[30] *The Benefits of Banking*, supra note 14.

28.     Reasonable as that take-away may be, it is a far cry from what that term actually means.  Clicking the hyperlink for that term takes you to Cryo-Cell's "Transplant / Infusion Matrix," which again fails to define this term.[31]   At the very bottom of that page, Cryo-Cell provides another link to download the matrix as a PDF.  Finally, on the PDF download, Cryo-Cell appears to suggest that a 100% viability record simply means that "[a]ll specimens released by Cryo-Cell have been viable when thawed."[32]   Even by this definition, the viability rate seems suspect considering the well-known issues with thawing throughout the industry.  Nonetheless, by either definition Defendant's statements are designed to intentionally mislead reasonable consumers into believing an entirely false set of facts.

29.     Similarly, Cryo-Cell brags that "cord blood treatments have been performed more than 35,000 times around the globe to treat cancers (including lymphoma and leukemia), anemias, inherited metabolic disorders and some solid tumors and orthopedic repair."[33]   Although this may be true as a factual matter, it is deeply misleading.  The article that Cryo-Cell cites for this proposition is not limited to private-banking, or even autologous treatments or allogeneic treatments between a donor and a family member.  Rather, the article appears to reference cord-blood transfusions *in total*—that is, including public cord blood bank transplants.[34]   In fact, as the abstract to that article states, "public banks have released ~30 times more [umbilical cord blood] units for therapy" than private cord-blood banks.[35]

---

[31] *Cord Blood Transplants: Transplant/Infusion Matrix*, supra note 27.

[32] *Transplant/Infusion Record: A History of Success,* CRYO-CELL INT'L (last visited Nov. 9, 2022), https://www.cryo-cell.com/CryoCell/files/54/540b7a87-eaa9-4d6d-8a83-54e874fea4c7.pdf.

[33] *Cord Blood Banking: What is cord blood banking?*, supra note 16.

[34] K.K. Ballen et al., *Umbilical cord blood donation: public or private?*, NAT'L LIBRARY OF MED. (Oct. 2015), https://pubmed.ncbi.nlm.nih.gov/26030051/.

[35] *Id.*

30.     Cryo-Cell likewise argues that "the chance of finding a match [through a public cord-blood bank] is low…."[36]  This is false.  "A 2014 study in the New England Journal of Medicine found that, depending on a patient's ethnic background, 66 percent to 97 percent can find a suitable match among donated umbilical cord-blood units or live bone-marrow donors in the National Marrow Donor Program's Be the Match Registry."[37] Defendant makes this false statement to induce new parents into purchasing its product, keeping them in the dark about a free, public option for cord blood treatments.

31.     There are numerous other potential shortcomings with private-blood banking that Cryo-Cell attempts to sweep under the rug.  For example, Cryo-Cell touts "promising research" into cord-blood's potential to treat conditions like heart disease, Alzheimer's, and diabetes.  But for those conditions, as of 2020, no therapy had made it past Phase 2 trials, much less earned FDA approval.[38]  Further, unlike public banks, which are heavily regulated by the FDA, private banks like Cryo-Cell do not need to meet the same quality or viability standards and sometimes do not impose a floor on how many stem cells must be collected.  That is, there is no guarantee that the banked cord-blood will contain enough stem cells for a successful transplant, particularly for older children or adults.

32.     Given these facts, it is no wonder that prominent institutions like the American College of Obstetricians and Gynecologists state that "[s]toring a child's stem cells in a private bank as 'insurance' against future disease is not recommended."[39]  But this has not stopped Cryo-Cell from aggressively pushing its misleading and false advertising efforts.  As a result of those

---

[36] *The Benefits of Banking*, supra note 14.

[37] Grant, supra note 23.

[38] Dana Jannar, *Should You Bank Your Baby's Cord Blood?*, N.Y. TIMES (Dec. 18, 2020), https://www.nytimes.com/2020/12/18/parenting/pregnancy/cord-blood-banking.html.

[39] *Cord Blood Banking: FAQs*, supra note 1.

efforts, tens of thousands of parents will be out thousands of dollars for a service they and their children will never be able to use.  Cryo-Cell, meanwhile, has reaped hundreds of millions of dollars from expectant parents.

## CLASS REPRESENTATION ALLEGATIONS

33.     Plaintiff asserts her claims as a class action pursuant to Fla. R. Civ. P. 1.220.

34.     Plaintiff seeks certification of a class of all consumers in the United States who contracted with Defendant for private cord blood banking, because each class member's contract contains a choice of law provision applying Florida law.

35.     The Class consists of all United States residents, including Plaintiff, who: (a) on or after May 18, 2018; (b) contracted with Cryo-Cell for cord blood collection or storage services; (c) agreed in their contracts with Cryo-Cell to store cord blood for a fee; (d) have fully performed their contractual obligations; and (e) have not used their child's banked cord blood for any medical purpose.  The class period will be from May 18, 2018, to the date of class certification (hereinafter the "Class Period").

36.     Plaintiff reserves the right to amend this definition as discovery proceeds and to conform to the evidence.

37.     Excluded from the Class are Cryo-Cell, its agents, representatives, and employees; any judge to whom this action is assigned; and any member of that judge's staff and immediate family.

38.     While the exact number of Class Members is unknown at this time, Plaintiff submits that, upon information and belief, there are thousands of individuals throughout the United States who are potential Class Members in this action.  Because the Class Members are so numerous, individual joinder of these Class Members is impracticable.

39.     Plaintiff further alleges that the Class Members will be ascertainable through Cryo-Cell's electronic records, data, and databases.

40.     There are common questions of law and/or fact shared by Plaintiff and each member of the Class.  These common questions of law and/or fact include, but are not limited to, the following:

    a.      Whether Cryo-Cell's marketing tactics and other conduct were deceptive, unfair, false, or misleading to a reasonable consumer;

    b.      Whether Cryo-Cell breached its contractual obligations;

    c.      Whether Plaintiff and the Class Members conferred a benefit upon Cryo-Cell, and whether Cryo-Cell accepted and retained that benefit;

    d.      Whether it would be inequitable for Cryo-Cell to retain the benefits it accepted from Plaintiff and the Class Members;

    e.      Whether Plaintiff and the Class Members acted in reliance on Cryo-Cell's knowing false statements or misrepresentations;

    f.      Whether any of Cryo-Cell's conduct caused injury to Plaintiff and the Class Members.

41.     Based on the above questions of law and fact, Plaintiff's claims are typical of the claims that would be asserted by other Class Members in that, in proving her claims under Florida law, she will simultaneously prove the claims of all Class Members.  The rights afforded under Florida law are the same for Plaintiff and Class Members.  Each Class Member had the same interaction with Cryo-Cell.

42.     Plaintiff is a Class Member.  She is an adequate representative of the Class Members because her interests do not conflict with the interests of other Class Members, and she

14

will fairly and adequately protect their interests.   Additionally, Plaintiff is cognizant of her responsibility as a class representative and has retained experienced counsel fully capable of, and intent upon, vigorously pursuing the action.   Class counsel have extensive experience in class action litigation.

43.     Plaintiff's cause of action against Cryo-Cell may be maintained as a class action under Fla. R. Civ. P. 1.220(b)(1)(A), because the prosecution of separate claims by individual Class Members would create a risk of inconsistent or varying adjudications for Class Members, which would establish incompatible standards of conduct for Cryo-Cell.

**COUNT I**

**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

44.     Plaintiff re-alleges paragraphs 1-43 as if fully set forth herein and further alleges the following.

45.     Count I is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  Plaintiff brings Count I individually and for the Class Members defined above.

46.     At all material times, Plaintiff and all Class Members were consumers within the meaning of Fla. Stat. § 501.203 and are entitled to relief under FDUTPA in accordance with Fla. Stat. § 501.211.

47.     At all material times, Cryo-Cell conducted trade and commerce within the meaning of Fla. Stat. § 501.203.

48.     Cryo-Cell has engaged in objectively unlawful schemes and courses of conduct through one or more of the unfair and deceptive acts and practices alleged above, which were likely to deceive a consumer acting reasonably in the same circumstances.

49.     The misrepresentations and deceptions, and concealment and omissions of material facts alleged in the preceding paragraphs, occurred in connection with Cryo-Cell's trade and commerce in Florida.

50.     Cryo-Cell's unfair and deceptive acts and practices violate Fla. Stat. § 501.204.

51.     Cryo-Cell's FDUTPA violations aggrieved Plaintiff, allowing her to seek declaratory relief on behalf of the Class Members under Fla. Stat. § 501.211(1).

52.     Further, Plaintiff and the Class Members have suffered losses because of Cryo-Cell's unfair and deceptive acts, and thus Plaintiff seeks actual damages pursuant to Fla. Stat. § 501.211(2), on behalf of herself and the Class Members, in an amount to be proved at trial.

53.     Plaintiff also seeks on behalf of herself and the Class Members, her reasonable attorneys' fees and costs pursuant to Fla. Stat. § 501.2105.

## COUNT II

## BREACH OF CONTRACT

54.     Plaintiff re-alleges paragraphs 1-43 as if fully set forth herein and further alleges the following.

55.     Count II is a breach of contract claim brought under Florida law.  Plaintiff brings Count II individually and for the Class Members.

56.     Plaintiff and each of the Class Members entered into valid contracts with Cryo-Cell for the collection and storage of cord blood.

57.     Plaintiff and the Class Members have fully performed their obligations under the contracts.

58.     Cryo-Cell materially breached those contracts by promising to supply services that it cannot fulfill, including, for example, autologous transplants of cord blood for FDA-approved treatments.

59.     Plaintiff and the Class Members have suffered damages, in an amount to be proven at trial, because of Cryo-Cell's material breach.

<u>**COUNT III**</u>

<u>**UNJUST ENRICHMENT**</u>

60.     Plaintiff re-alleges paragraphs 1-43 as if fully set forth herein and further alleges the following.

61.     Count III is an unjust enrichment claim brought under Florida law.  Plaintiff brings Count III individually and for the Class Members.  To the extent necessary, Plaintiff pleads Count III in the alternative to Count II.

62.     Plaintiff and all Class Members conferred a benefit on Cryo-Cell through the payment of fees intended to pay for collection and storage services offered by Cryo-Cell.

63.     Cryo-Cell voluntarily accepted and retained the benefit that Plaintiff and the Class Members conferred on Cryo-Cell, with full knowledge that its acceptance and retention of those fees bore virtually no relationship to the services Cryo-Cell advertises.

64.     Under the circumstances of Cryo-Cell's objectively deceptive, unfair, and fraudulent acts described above, it would be inequitable to allow Cryo-Cell to retain this benefit without paying the value of the benefit to Plaintiff and the Class Members.

## COUNT IV

## DECLARATORY JUDGMENT

65.     Plaintiff re-alleges paragraphs 1-43 as if fully set forth herein and further alleges the following.

66.     Count IV is a claim for a declaratory judgment pursuant to Chapter 86, Florida Statutes.  Plaintiff brings Count IV individually and for the Class Members.

67.     Plaintiff does not seek a forward-looking declaration, but merely seeks a declaration resolving a present controversy concerning past acts.

68.     A bona fide controversy presently exists between Plaintiff and the Class Members on one hand and Cryo-Cell on the other, as to whether Cryo-Cell has violated FDUTPA, breached its contracts with Plaintiff and the Class Members, or otherwise violated applicable law.

69.     Plaintiff is an interested party who is in doubt about and seeks a declaration regarding the Class Members' and her rights and legal relationships with regard to their contracts with Cryo-Cell and the application of applicable law.

70.     Plaintiff's interests are adverse to Cryo-Cell, as Plaintiff's claims against it could be detrimental to Cryo-Cell's business practices and financial state.  Further, the Plaintiff's requested declaration deals with present, ascertainable facts. Plaintiff does not seek a declaration regarding future facts or rights.

71.     Plaintiff and all putative Class Members are in the same predicament, each suffering from Cryo-Cell's violations of state law and breaches of the parties' contracts.

72.     The rights, status, or equitable relations of the parties are affected by the express terms of the policy and Florida law.  Accordingly, pursuant to Chapter 86, Florida Statutes,

Plaintiff and the Class Members may obtain a declaration of rights, status, or other equitable or legal relations thereunder.

73.     Chapter 86, Florida Statutes, is state substantive law, which is to be liberally administered and construed. *See* § 86.101 Fla. Stat.

74.     Section 86.111, Florida Statutes states: "The existence of another adequate remedy does not preclude a judgment for declaratory relief."  Thus, regardless of whether damages are available to Plaintiff and the Class Members, the Court may determine the parties' respective rights, status, and other equitable or legal relations under the parties' contracts and applicable law.

75.     Section 86.011(2), Florida Statutes states: "[t]he court may render declaratory judgment on the existence, or non-existence . . . Of any fact upon which the existence or nonexistence of such immunity, power, privilege, or right does or may depend, whether such immunity, power, privilege, or right now exists or will arise in the future." Thus, the Court may determine whether Cryo-Cell has breached its contracts with Plaintiff and the Class Members or whether Cryo-Cell has otherwise violated applicable law.

76.     Section 86.021, Florida Statutes states: "Any person claiming to be interested or who may be in doubt about his or her rights under a . . . contract . . . may have determined any question of construction or validity arising under such . . . contract . . . or any part thereof, and obtain a declaration of rights, status, or other equitable or legal relations thereunder." Thus, the Court may determine the rights of "any person" (such as Plaintiff or each Class Member) who is in doubt about his or her rights under their contracts with Cryo-Cell and any applicable laws.

77.     Section 86.031, Florida Statutes states: "Any declaratory judgment rendered pursuant to this chapter may be rendered by way of anticipation with respect to any act not yet done or any event which has not yet happened, and in such case the judgment shall have the same

19

binding effect with respect to that future act or event, and the rights or liability to arise therefrom, as if that act or event had already been done or had already happened before the judgment was rendered."  This statute confirms that the Court may determine whether Cryo-Cell's past actions breached its contracts with Plaintiff and the Class Members.

78.     Section 86.071, Florida Statutes states, in pertinent part, that when a declaratory action "concerns the determination of an issue of fact, the issue may be tried as issues of fact are tried in other civil actions in the court in which the proceeding is pending." Thus, the existence of disputed fact issues does not prevent the Court from providing declaratory relief under Chapter 86.

79.     Section 86.061, Florida Statutes provides, in pertinent part that the courts may grant further or supplemental relief based on a declaratory judgment.  Thus, the Court may grant further or supplemental relief based on a declaratory judgment.

80.     Plaintiff's and the Class Members' rights depend on the Court's determination of the facts and application of the facts to law to resolve the disputes contained herein.

81.     Individually, and on behalf of the Class Members defined above, Plaintiff now petitions for a declaration that Cryo-Cell's willful misrepresentations and omissions provide a basis for rescission of the contracts of Plaintiff and Class Members.

82.     Individually, and on behalf of the Class Members defined above, Plaintiff and the Class Members seek rescission of their contracts with Cryo-Cell based on the declaration they seek here.

**COUNT V**

**FRAUDULENT INDUCMENT**

83.     Plaintiff re-alleges paragraphs 1-43 as if fully set forth herein and also alleges the following.

84.     This is a count for fraudulent inducement.

85.     Cryo-Cell, as detailed in the allegations herein, made multiple false statements concerning material facts related to a parent's decision to purchase cord blood banking services. *See*, supra, ¶ 21.

86.     Cryo-Cell knew at the time of making these representations that they were false and an inaccurate representation of what Cryo-Cell's services could provide to Plaintiff and Class Members.

87.     In making these misrepresentations, Cryo-Cell intended to induce action by Plaintiff and Class Members. Specifically, Cryo-Cell sought to induce new parents into purchasing its services, thereby committing to spend thousands of dollars, while knowing that its services could not provide the benefits that Cryo-Cell claimed.

88.     Plaintiff and Class Members relied on these false statements to their detriment, as each spent thousands of dollars for services that are wholly unable to meet their intended and represented purpose.

## **PRAYER FOR RELIEF**

Plaintiff and the Class Members the following relief:

   a.  Certification of the Class;

   b.  A monetary judgment against Cryo-Cell for actual damages suffered by Plaintiff and the Class Members;

   c.  A declaratory judgment that Cryo-Cell violated FDUTPA, breached its contracts with the Class Members, and has been unjustly enriched;

d.  The costs of this action, including reasonable attorney's fees and pre-judgment and

post-judgment interest as provided by law; and

e.  Such other relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.


Date: January 6, 2023                              Respectfully submitted,


*s/ Alec H. Schultz*
Alec H. Schultz
Carly A. Kligler
HILGERS GRABEN PLLC
1221 Brickell Avenue, Suite 900
Miami, Florida 33131
Telephone:  305.630.8304
Email:  aschultz@hilgersgraben.com
Email: ckligler@hilgersgraben.com

*Counsel for Plaintiff and the Proposed
Class*

22